FIRST NATIONAL BANK OF BRINKLEY and Paul
FARRELL *v.* Freeland NASH, Otto CLIFTON, and
EDEN FARMS, INC.

CA 80-516                                        617 S.W. 2d 24

Court of Appeals of Arkansas
Opinion delivered June 17, 1981

*Sharp & Spratt*, by: *James B. Sharp*, for appellants.

*Daggett, Daggett & Van Dover*, by: *Jimason Daggett*; and *Ray & Donovan*, by: *Robert J. Donovan*, for appellees.

TOM GLAZE, Judge. This case arose out of a dispute involving the sale of a farming operation and whether a real estate commission was to be paid a real estate broker by appellees as a result of the sale. Appellees, Freeland Nash (Nash) and Otto Clifton (Clifton) formed a corporation, appellee Eden Farms, Inc. (Eden Farms), and purchased a nine hundred acre farm in 1974. The underlying facts in this dispute are somewhat unusual because the real estate broker, Larry Guthrie (Guthrie), who assisted in the sale of the farm, was also the President of the appellant First National Bank of Brinkley (Bank), which had loaned monies to appellees to finance their farming operation. Additionally, appellant Paul Farrell (Farrel¹), a majority shareholder and director of the Bank, was involved in the negotiations in the sale of the farm, and although he does not claim a real estate commission, Farrell does claim an interest in any commission owed Guthrie on the sale because of monies he claims to have previously loaned Guthrie.

The legal authorities cited by the parties are exhaustive, and the arguments made by both sides are well presented. The case law and legal principles applicable to this cause are well settled. In each case cited by the parties, it is the application of law to the respective fact situations which poses the greatest problem. Thus, a clear understanding of the facts before us must first be reviewed. Three years after Clifton and Nash formed Eden Farms and financed its operation through the Bank, Eden Farms' operation ran into financial trouble. Through the efforts of Guthrie and Farrell, a purchaser was located who agreed to buy Eden Farms. On March 25, 1977, an offer and acceptance was executed. Five days later, this sale was closed by the parties in Guthrie's office in the Bank. At this time, a dispute arose as to whether Guthrie was entitled to a real estate commission in the amount of $22,750. Because of this dispute, Guthrie proceeded to close the sale by disbursing all monies and paying Eden Farms' debts to the Bank, but placed the remaining balance of the sale proceeds, $22,293.30, in his account, as agent, until the commission issue could be resolved.

No further action was taken until June 15, 1977. At this time, Guthrie wrote a check on the disputed account to Farrell for $17,500. He wrote another check to Farrell for $2,500 on July 28, 1977. Guthrie later took the balance, $2,293.30, on October 19, 1977.

In November, 1977, Nash brought action against Guthrie for the $22,293.30. After taking Guthrie's discovery deposition, Nash then sued the Bank, alleging it had knowledge of the funds in Guthrie's trust or escrow account and the Bank should have prevented Guthrie from converting these funds. Nash also made Farrell a party to the suit, alleging Farrell and Guthrie wrongfully converted the funds. Eden Farms intervened in the suit and adopted all of the relief sought in Nash's complaint. On an unrelated matter, the Bank counterclaimed against Nash on two notes concerning a separate indebtedness.

When this case went to trial, Guthrie failed to appear, but all other parties were represented and presented evidence. The trial court held Guthrie liable to Eden Farms for $22,750 and the Bank jointly and severally liable for the $22,293.30, which had been placed in Guthrie's account. Farrell was held jointly and severally liable for the $20,000 he received. The court awarded the Bank judgment on its counterclaim plus attorney's fee of 5% of the debt owed by Nash. The Bank and Farrell appeal and Nash cross appeals the trial court's decisions.

The Bank's initial point raised for reversal is that it is not liable for Guthrie's withdrawal of the disputed funds from the trust or escrow account he maintained at the Bank. In its argument, the Bank recognizes the long established rule of agency enunciated by the court in *Hill* v. *State*, 253 Ark. 512, 487 S.W. 2d 624 (1972), that:

> ... a corporation, which can act only through its officers and agents, is affected with notice which comes to an officer, agent or employee in the line of his duty and the scope of his powers and authority and that knowledge ... is ordinarily imputed to the corporation.

The Bank contends this rule of law is not applicable to the facts here because: (1) The Bank neither participated in nor was a beneficiary of any of the commission funds in dispute; and (2) Guthrie had an individual interest in the commission, thus his knowledge and acts should not be imputed to the Bank.

Concerning the Bank's first point, it relies on the following legal principle announced in *Bank of Hartford* v. *McDonald*, 107 Ark. 232, 154 S.W. 512 (1913):

> The appellant Bank had no interest whatever in the property and derived no benefit from the venture and was in no way responsible for its success or failure, and it has been held that where a trustee has full control over the funds deposited in a bank, he may draw them out of the bank *ab libitum*, and the bank incurs no liability in permitting this to be done, so long as it does not participate in the breach of trust, resulting in a misapplication of the funds.

We have no difficulty in accepting the Bank's argument that it derived no benefit from the transaction in question. While it is true the Bank received none of the disputed funds held in Guthrie's account, it certainly benefited from the sale of the Eden Farms operation. There is no dispute that Eden Farms was in financial trouble, a matter which concerned the Bank since it had a sizeable outstanding loan made to Eden Farms. It was the Bank's majority shareholder, Farrell, who actually sought and found a buyer for the Eden Farms operation which in turn permitted Eden Farms, Nash and Clifton to pay off their loan to the Bank. The Bank, through its president, Guthrie, actively negotiated and closed the sale of its farm operation. The Bank, of course, would urge us to consider the commission dispute as a separate matter, *i.e.*, although the Bank may have benefited from the sale of the farm, it received no benefit from what transpired in connection with the commission dispute. We have problems with severing or bifurcating the sale transaction as the Bank would have us do. The Bank officials, Guthrie and Farrell, continued to participate in the actions which took place

subsequent to the sale and relative to the commission dispute. The commission question crystalized at the same time the sale was to be closed. If Guthrie had not agreed to hold the $22,293.30, as agent, there is a fair inference from the facts that the sale may not have been consummated. Since the Bank's president took this action to consummate the sale, the Bank cannot later abdicate its responsibility regarding these trust funds merely because it will not be the recipient of any portion of the funds. The Bank, through Guthrie, undertook to close the sale of Eden Farms and until all monies were disbursed, the sale transaction was never fully closed.

The Bank's second point is premised on the rule of agency that the knowledge of the agent will not be imputed to the principal where the agent acts for himself or has a personal interest in the transaction, thus rendering it improbable that he will report his knowledge to his principal. *Howard* v. *Wasson*, 187 Ark. 756, 62 S.W. 2d 30 (1933). See also, 19 Am. Jur. 2d *Corporations* 672. In brief, the Bank contends Guthrie's interest in the disputed commission precludes his knowledge and acts from being imputed to the Bank. However, whether or not Guthrie claimed an interest to the Eden Farms commission was in serious conflict at trial. Nash and Clifton testified, *without objection*, that they never agreed to a commission and that Guthrie had disclaimed any interest in a commission prior to closing the sale of the farm. Although the Bank now objects on appeal that this testimony of Nash and Guthrie is hearsay and should not be considered, Guthrie is a party-opponent in this cause and the statement attributed to him is clearly admissible as an admission. Rule 801 (d) (2) (i), *Uniform Rules of Evidence*. Even if he had not been made a party, the Guthrie statement would have been permitted as a hearsay objection under Rule 804 (b) (3), *i.e.*, a statement which at the time it was made was contrary to Guthrie's pecuniary or proprietary interest. We hold this testimony of Nash and Clifton alone is sufficient to support the trial court's finding that Guthrie was not engaged in a personal, separate enterprise nor in an interest adverse to that of the Bank. Also without objection, Clifton testified that Guthrie stated it

was Farrell who wanted the commission. Thus, regardless of Guthrie's abandoned interest in the commission, a dispute still continued over these monies and was reason enough for Guthrie to have held the funds in trust until the matter was fully resolved. Although it appears from the record that the Bank did not object to Clifton's reference to Guthrie's remark concerning Farrell's claim to the commission, we doubt it matters. The statement was certainly admissible to show why Guthrie held the disputed funds even though the remark, on proper objection, may have been excluded for the purpose of showing the truth of the matter asserted. See Rule 803 (3), *Uniform Rules of Evidence*.

The Bank contends the trial court admitted, over objection, incompetent testimony on other occasions that Guthrie disclaimed any commission. Even if this were true, there is sufficient evidence in the record to otherwise support its finding and decision, and any error in this regard would be harmless. See *M. W. Elkins & Company* v. *Ashley*, 195 Ark. 313, 112 S.W. 2d 627 (1938). The Bank urges that the trial court should have given more weight to the testimony offered by the purchaser of Eden Farms, who stated that at the closing Guthrie said that he was entitled to a commission. On review, we must affirm the trial court's findings unless they are "clearly erroneous (clearly against the preponderance of the evidence), and due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses." Rule 52, *Arkansas Rules of Civil Procedure*. In this same vein and consistent with our findings above, we further hold there was sufficient evidence to support the trial court's conclusion that Guthrie was at all times acting as the chief executive officer of the Bank in an effort to effect the sale of Eden Farms, and the acts and knowledge of Guthrie were imputable to the Bank, making it liable to Eden Farms for the conversion of the $22,293.30 in question.

We have less difficulty in our consideration of Farrell's assignment of error. The trial court found that Farrell did not receive the $20,000 from Guthrie in the ordinary course of business nor did he part with anything of value in

exchange. Farrell testified that he knew Guthrie was holding these funds as agent as the result of the Eden Farms sale transaction. These funds were clearly not Guthrie's, and Farrell knew it. Farrell was also on the signature card to this account which was noted as "Larry Guthrie, Agent." Without question, Farrell cannot be said to be an innocent recipient of funds misappropriated from the Guthrie account. Farrell was involved in this matter from its inception, *i.e.*, when he found a willing buyer for the Eden Farms operation. In spite of his knowledge that Guthrie held these disputed funds as agent, Farrell instructed Guthrie to write him checks on the account for $17,500 and $2,500. These funds were not Guthrie's to give, and we believe the record amply supports the conclusion that Farrell was aware of this fact. We agree with the trial court's holding that Farrell is liable to Eden Farms in the $20,000 amount he received from Guthrie.

The last issue we must consider involves two promissory notes (not related to the Eden Farms matter) which reflect the loan of monies by the Bank to Nash. Both notes provide that if Nash defaults in payment and collection is necessary, he agrees to pay the holder ten percent (10%) additional on the principal and interest as attorneys' fees. The trial court awarded the Bank judgment against Nash on the two notes and granted it an additional five percent (5%) on the past due principal and interest as attorneys' fees. Although the Bank failed to object to this award of attorneys' fees below, the Bank argues on appeal that the court should have awarded 10% attorneys' fees as provided by the notes and authorized under Ark. Stat. Ann. § 68-910 (Repl. 1979). Since this issue was not brought to the trial court's attention, we would normally not consider the matter on appeal. Nash, however, contended at trial and now on cross appeal that the Bank should not be entitled to any interest because it converted the Eden Farms commission funds, which are monies which could have been applied on Nash's indebtedness. Since the attorneys' fees issue is before us on Nash's cross appeal, we will also consider the respective arguments of both parties.

As mentioned previously, the Bank contends it is entitled to the entire 10% attorneys' fees provided in the two notes. Neither the Bank nor Nash cite any Arkansas cases on this point. Therefore, we will first review the language of § 68-910, which provides:

> Attorney's fee — Provision enforceable. — A provision in a promissory note for the payment of reasonable attorneys' fees, not to exceed ten percent [10%] of the amount of principal due, plus accrued interest, for services actually rendered in accordance with its terms is enforceable as a contract of indemnity. [Acts 1951, No. 350, § 1, p. 841.]

The foregoing law was enacted by our legislature in 1951. Until 1951, a stipulation in a promissory note which provided for attorneys' fees in any amount was held to be against public policy and unenforceable. See *Holimon v. Rice*, 208 Ark. 279, 185 S.W. 2d 927 (1945). Apparently the only occasion on which the issue before us has been considered was in the case of *First National Bank of Magnolia, Arkansas* v. *Magnolia Steel Corporation*, 261 F. Supp. 283 (W. D. Ark. 1966). In *Magnolia Steel*, there were two notes, one provided for a 10% reasonable attorney's fee and the second provided for a reasonable attorney's fee not to exceed 10%. The court allowed 10% attorneys' fees on each note but not before it considered certain factors to determine if the total amounts of attorneys' fees called for by the notes were reasonable.[1] In this regard, the court considered: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to conduct the case; (2) the customary charges of the Bar for similar services; (3) the amount involved in the controversy and the benefit resulting to the client from the services. We agree with the federal court's analysis of § 68-910 and conclude that although it allows the parties to provide for an attorney's fee not to exceed 10%, it is within the court's province to determine if

---

[1]The court followed Canon 12 of the American Bar Association's Canon of Professional Ethics to determine whether the attorneys' fees sought were reasonable. Canon 12 was adopted by the Arkansas Supreme Court by per curiam order dated June 21, 1976, effective July 1, 1976.

the percentage to which the parties agreed is reasonable in view of the foregoing factors.

Finally, we consider Nash's argument that the interest due on these notes should be abated since the Bank converted the Eden Farms funds. Nash offers no legal authority to support his argument but apparently couches his position in terms of estoppel, a defense he raised in his pleading below. We find no merit in Nash's contention. The two notes executed by Nash were personal debts and not obligations of Eden Farms. The trial court awarded judgment to Eden Farms, not Nash, when it decided the Bank (along with Guthrie and Farrell) was liable for the conversion of the disputed commission funds. There is entirely no evidence in the record which connects the Eden Farms matter with the notes signed by Nash. Under these facts, we fail to see how equitable estoppel can be applied against the Bank.

Affirmed.

CRACRAFT, J., not participating.